## STATE v. BARNEY McLAUGHLIN.

84 N. W. (2d) 664.

July 26, 1957—No. 37,090.

310

*Hvass, Weisman, Peterson, King & Schwappach,* for appellant.

*Miles Lord,* Attorney General, *George M. Scott,* County Attorney, *C. Paul Jones,* First Assistant County Attorney, and *Bruce C. Stone,* Assistant County Attorney, for respondent.

NELSON, JUSTICE.

An information was filed January 20, 1956, in the District Court of Hennepin County charging the defendant, Barney McLaughlin, with unlawfully and feloniously committing the crime of kidnapping one Clarence E. Rick, in violation of M. S. A. 619.34 and 610.12. It appears that the defendant is also known as Barney Edward McLaughlin and Bernard Edward McLaughlin. The defendant was thereupon tried and convicted. The judgment recites that the defendant, having been found "guilty of the said crime of kidnapping," is sentenced to confinement in the penitentiary until discharged by due course of law or by competent authority. Defendant appeals from this judgment.

The facts involved in this appeal are substantially as follows: Clarence E. Rick was manager of the Humpty-Dumpty grocery store located at 4805 Lyndale Avenue North, Minneapolis; Rick resided at 4505 Oakland Avenue South in Minneapolis. Rick left the grocery store which he managed on December 21, 1955, at approximately 10:15 p. m. and before doing so secured the doors and locked up the store. He was the owner of a 1955 Oldsmobile with a beige top which he drove home. It took him about one-half hour to travel the distance to his home. As he drove into his garage and proceeded to get out of his car, a man with a mask on stepped into his garage and said: "Rick, get back in that car." Mr. Rick was then compelled to drive his automobile, at the direction of the man who ordered him to do so, at the point of a gun. Mr. Rick drove as directed until he reached Fourth Avenue and 45th Street where he was instructed to stop. It appears that at that point Mr. Rick and his abductor were joined by another man. Rick was then instructed to get into the back seat and lie face down and to keep his eyes closed, the car continuing in the general direction of the Humpty-Dumpty store. Rick

testified that during that time inquiry was made as to how much money he had in the store safe; that the second man who had joined Rick's abductor spoke in a Swedish accent. There is other testimony that he did not speak in a Swedish accent but appeared to change his voice at different times. Rick was driven to the store and, in front of it and while the car was still in motion, was questioned about which entrance could be used to enter the store. He was told by one of the abductors not to try to be a hero or make any break because they had him covered.

When they were about to enter the store, one of the abductors spoke up and said: "There goes the patrol car." The automobile with Rick in it was then driven around the block two times. Following this the auto stopped and Rick heard someone say "What is going on here?" and then somebody said: "Hi, Russ." From this point on the record indicates confusion and a lot of activity. Rick testified that he was ordered to get out of the car by the first abductor, whom Rick later identified as Richard Paul Thompson. Rick sensed at that time that Thompson and he were surrounded by police officers who were attempting to apprehend his abductors and prevent a planned robbery of the store. Thompson, realizing he was surrounded, finally gave up his gun and surrendered to the police. Rick testified that prior to being intimidated at the point of a gun when he was abducted from his garage by Thompson, that as far as he could recall he had never known Thompson or heard his voice before.

One Donald N. Neuenfeldt, a Minneapolis policeman, appeared as a state's witness and testified with respect to his participation in the apprehension of Thompson and the liberation of Rick. He had been on duty with Russell E. Wasser another police officer who worked with him as a partner on that evening. These officers were dispatched by radio to the area of the Humpty-Dumpty store and cautioned to look out for the Oldsmobile owned by Rick which they sighted in the vicinity of the store. Their testimony is that they got out of the squad car and that Neuenfeldt shouted "What is going on here, who are you?" addressing his inquiry to the occupants of the Rick automobile. The testimony is that Neuenfeldt at that time saw another man approaching the Rick car from an alley: that he heard a remark made but does not

know by whom and that remark was "Hi, Russ." Just then the Rick car started to move and later came to a halt in a snowbank. He testified that at that time some person came out of an alley near the store. The state now contends that the man was the defendant. Several rapid events occurred thereafter culminating in the final surrender of Thompson to the officers. However, the whereabouts of the man in the alley was not discerned and that man apparently had no other part in the events that occurred subsequent to the appearance of the police. Whatever claimed identification of this man coming out of the alley was made by the witness Neuenfeldt, it did not occur until five days after the capture of Thompson, Rick's original abductor. He first reported five days later in writing that the defendant was the person whom he saw coming out of the alley. At that time he described him as a man whom he saw coming out of the alley and who he thought was the defendant, as being about 150 to 160 pounds; that the man wore a three-quarter-length tan jacket and a ski cap with the earflaps down. The defendant's weight according to undisputed testimony when fully dressed was at the time 207 pounds and he was six feet, one inch tall and there is no testimony to dispute either him or his family in that respect; nor in that he wore a hat, not a ski cap with earflaps down, on the evening in question and a brown suede jacket, not three-quarter-length, which belonged to one of his sons.

The other policeman and state's witness, Russell E. Wasser, who was a partner of Neuenfeldt's in apprehending Thompson and liberating Rick, it appears saw the same person coming out of the alley described by Neuenfeldt. Officer Wasser stated unequivocally that he could not say that the defendant was the man and further stated that he did not know if the defendant was the man. It appears that Officer Wasser had been a boxer and had on occasion boxed with and worked out with defendant in the gymnasium in the years past. He had also worked in a restaurant on Hennepin Avenue and had occasion to see defendant frequently while he was a detective on the Minneapolis police force. Yet nowhere in the testimony does Wasser identify the defendant as being one seen in the vicinity of the scene of the crime or as a participant in the Rick kidnapping of that evening. The witness Wasser admitted under oath that, in the original statement made by himself and

Officer Neuenfeldt to the police stenographer, it was stated that Thompson's accomplices were Bob Scott and Jim McLean. Both Neuenfeldt and Wasser signed that statement.

Several witnesses including the defendant testified concerning his whereabouts and activities during the night of December 21, 1955, when the kidnapping of Rick occurred. It appears from this testimony that the defendant was during that time employed as a bartender at what is known as Dugan's Bar at Third Street and Washington Avenue South; that the defendant left the bar that evening at about 10:30 and that he returned at approximately ten minutes after 1 a. m. Defendant testified as to his whereabouts in the meantime which included going to the bus depot to meet a son whose arrival was expected for the Christmas vacation.

The testimony of the witness Thompson, who had pleaded guilty and appeared as a witness for the state, clearly indicates that he was an accomplice of whatever persons were with him when the crime of kidnapping Rick was committed. Thompson admitted that he had first named as his accomplices Bob Scott and Jerry McLean. He also named one Bob DeJongers as one of his accomplices. Bob DeJongers had not been located at the time of the trial. Thompson admitted being the masked individual referred to by Rick. Later he implicated defendant and stated that the latter was the originator of the plan to kidnap Rick in conjunction with the plan to burglarize the Humpty-Dumpty store. There was testimony that defendant was an acquaintance of Thompson's and that he had used a car which Thompson owned and drove around at different times during a one-month period preceding the crime. Defendant in his testimony admitted those facts but denied that he had any participation in the crime and testified that he was at places other than the site of the crime at the time of its occurrence.

The record indicates that all testimony as to defendant's actual participation or involvement in the crime came from Rick's abductor. It is true that Officer Neuenfeldt testified at the trial that he saw another man approaching from the alley behind the car; that the man was just on the other side of the car from Neuenfeldt when somebody said "Hi, Russ"; that he did not know who said it; that he glanced at his partner; and that when the car had started to move a little bit he looked

straight into the face of the man who came out of the alley with all the intentions of getting into the car. That he could read the intention of the man approaching under all the circumstances and confusion is hardly convincing and is evidence of doubtful admissibility. He said the man was familiar to him but he could not recall his name, that he knew he had seen him before. The testimony is clear that he had gone to the house of the defendant approximately one year before to pick up an officer's badge which the defendant had worn when he was on a detective force, but the evidence indicates that the defendant was then in pajamas and that Neuenfeldt had but a momentary glance of him at that time, which was the only time he had any recollection of ever having seen him before.

The defendant did not learn that anyone had accused him of being involved in the attempted abduction of Rick and robbery of the Humpty-Dumpty store until Thursday evening, December 22, 1955, when he received a call from Inspector Wetherille of the Minneapolis police department who requested that he come in for questioning. At that time defendant told Inspector Wetherille he would come if the inspector would send a car for him and if the inspector would promise the defendant not to lock him up without placing a charge against him. In this conversation with the inspector defendant denied any knowledge of the Rick kidnapping and the attempted robbery. Thereafter, during the same week, Inspector Wetherille talked to defendant at defendant's home over the telephone several times. Defendant asked the inspector why a warrant had not been issued for him so that he, the defendant, could come in for arraignment and be released on bond. The defendant later learned about his alleged implication in the Rick kidnapping through a newspaper article published in a Minneapolis newspaper on December 22, 23, and 24, and therein it appeared that Thompson allegedly implicated the defendant.

State's witnesses Stanley C. Greaves and Edward R. Ott, Minneapolis detectives, testified that on December 30, 1955, in the course of their duty and upon orders of Inspector Wetherille to find defendant, they went to the home of the defendant but did not find him at home. The defendant testified that he spent each night at home and from the 21st to the 31st of December spent every evening in his home although he

left his home sometime each day and did not return until evening. The record is without direct evidence to dispute that fact. Following the call of Greaves and Ott defendant voluntarily went to the court house in Minneapolis on December 31, 1955, accompanied by one of his sons, at which time he was arraigned and released on bond. The defendant again denied unequivocally as he did at the trial that he was involved in any manner in the kidnapping of Rick and the attempted robbery. Both Greaves, and Ott testified that they had talked with defendant's wife on December 30, 1955, and that she had told them that he had been gone since the preceding Tuesday but that she had talked to him over the telephone.

Elva McLaughlin, the wife of the defendant, however, as a defense witness testified that on the evening of December 21, 1955, she went to the bus depot to meet their son who was coming home from the seminary; that he arrived at 11:30 in the evening; that the defendant joined them at about 12:15; and that he was wearing a brown suede jacket and a hat. Defendant's wife corroborated his testimony that he was home each night from the night when the crime was attempted on Rick and the Humpty-Dumpty store and that he spent each night at home until he voluntarily reported to the police. The state was unable to produce any direct testimony to the effect that he did not spend some part of each night at home. It appears also that the only time that officers Greaves and Ott had come to the home of the defendant looking for him was on the morning of December 30, 1955, and it does not appear that any other police officers had sought the defendant at his home during the period between the night of the kidnapping and the time when defendant went, voluntarily, to the court house on December 31, 1955.

It appears that none of the witnesses who testified for the state, with the exception of the witness Thompson, gave testimony that directly implicated the defendant as being an accomplice of Thompson in the attempted crime. It stands admitted in the record that Thompson, after first refusing to testify on constitutional grounds, stated that there were two persons with him when Rick was abducted, naming defendant and one Bob DeJongers as his accomplices. Thompson had, immediately after he had been apprehended and taken into custody, named as his

accomplices Bob Scott and Jerry McLean. The record indicates, however, that at the time Thompson named and testified that the defendant was one of his accomplices, he had already pleaded guilty to the kidnapping charge and was awaiting sentence.

On cross-examination the state's witness Thompson admitted that the person riding with him whom he had earlier identified as defendant, did not simulate any Swedish accent. He admitted being in a confused state of mind for quite a while preceding the date of the attempted kidnapping of Rick and the attempted robbery as a result of having been shot in the head two years previously and having shotgun pellets imbedded in his head. He testified that his memory was not very good since that incident; that he had been in two mental hospitals since that time. At the time of defendant's trial after the witness Thompson had pleaded guilty, he, Thompson, had petitioned the court to withdraw his plea of guilty and to enter a plea of not guilty on the grounds of insanity.

M. S. A. 634.04 deals with uncorroborated evidence of an accomplice and provides:

"A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."[1]

The legal issue involved upon this appeal is whether defendant was deprived of a fair trial as a result of the court's instruction to the jury on the issue of concealment and flight in view of the absence of any direct evidence on that issue and to which instruction defense counsel duly objected. In fact the sole issue presented on this appeal is whether the charge of the court on concealment and flight, in view of the ab-

---

[1] M. S. A. 610.12 provides:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission and whether present or absent, and every person who directly or indirectly counsels, encourages, hires, commands, induces, or otherwise procures another to commit a crime, is a principal, and shall be indicted and punished as such."

sence of any direct evidence on that issue, was prejudicial to the substantial rights of the defendant and if prejudicial was he by reason thereof deprived of a fair trial.

The defendant contends that the trial court erred in instructing the jury on concealment and flight as follows:

"The State contends that the defendant Barney McLaughlin after the events of December 21, 1955, concealed himself and was not available until he voluntarily surrendered himself on December 31, 1955, on which day the complaint was issued.

"Concealment from justice and its analogous conduct have always been deemed indicative of a consciousness of guilt. It is today conceded that the facts of concealment from custody or arrest are evidence of a consciousness of guilt.

"On the other hand, Barney McLaughlin, the defendant, and witnesses on his behalf contend that he did not conceal himself or flee from questioning or arrest.

"This is a question for you members of the jury to determine. If you determine that he did conceal himself, it is only a circumstance to be taken into consideration by the jury in connection with all the other circumstances in this case and the weight the jury should give it depends upon the circumstances detailed to you by the witnesses, either for the State or for the defense.

"On the other hand, if you determine that Barney McLaughlin did not conceal himself from December 21, 1955, to the 31st of December, then you need not give it any further consideration so far as this case is concerned."

Defendant admits that the trial court correctly instructed the jury that a defendant cannot be convicted solely on the uncorroborated testimony of an accomplice and in following this instruction on the sufficiency of corroboration by the following statement:

"However, the entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient."

After carefully examining the record, we reach the conclusion that it

indicates a complete absence of any direct evidence that the defendant concealed himself or attempted to flee to avoid questioning or arrest between the date of the Rick kidnapping December 21, 1955, and the date the defendant appeared voluntarily at the courthouse to answer to any claim or charge that he was a party to the Rick kidnapping and attempted robbery. No arrest had been made at the time he appeared at the courthouse voluntarily on December 31, 1955, and no information was filed against him until January 20, 1956.

This court has held that the flight of the accused after his arrest and when on bail is a circumstance which may be considered not as a presumption of guilt, but as something for the jury, and as suggestive of the consciousness of guilt; and the same is true of an attempt to escape or resistance to arrest, or passing under an assumed name. 5 Dunnell, Dig. (3 ed.) § 2464; State v. McTague, 190 Minn. 449, 252 N. W. 446.

When the proof is sufficient the trial court may instruct the jury that inference of guilt from the evidence of flight, in connection with other proof, may form the basis from which guilt may be inferred, but this should be qualified by a general statement of the countervailing conditions incidental to a comprehensive view of the question. State v. Shetsky, 229 Minn. 566, 40 N. W. (2d) 337; 5 Dunnell, Dig. (3 ed.) § 2464.

One accused of a crime cannot be convicted upon the uncorroborated testimony of an accomplice. The corroborating evidence, independent of the testimony of the accomplice, must tend in some degree to establish the guilt of the accused, but it need not be so weighty or full that, standing alone, it would justify a conviction. The corroboration must tend to convict the person charged, and it is not enough if it merely shows the commission of the offense or the circumstances thereof. While corroborating evidence must be such as tends to show some connection of the defendant with the acts constituting the crime charged, yet it is unnecessary that there should be corroboration as to every probative fact. Corroboration need not be direct and positive but may be circumstantial, nor does the statute require a case to be made out against the prisoner sufficient for his conviction before the testimony of an accomplice can be considered.

■ If such corroboration be circumstantial in nature, it must have standing as corroborative evidence which tends to convict the one that has been accused; it cannot be founded on mere suspicion; it must be corroborative in fact and constitute evidence which stands the statutory and legal corroborative test. Evidence which relates exclusively to the fact of the commission of the crime and the circumstances thereof, as distinct from defendant's connection therewith, is not sufficient. State v. Scott, 203 Minn. 56, 279 N. W. 832.

■ The requirement of § 634.04 that the testimony of an accomplice in crime must find support in and be bolstered by other corroborative evidence is based upon the theory that such testimony has been given by one admittedly corrupt and that it is likely to have been submitted in the hope of clemency. State v. Rasmussen, 241 Minn. 310, 63 N. W. (2d) 1; State v. Jackson, 198 Minn. 111, 268 N. W. 924; State v. Star, 248 Minn. 571, 81 N. W. (2d) 94.

■ The testimony on the part of the defense to the effect that various telephone calls were made by Inspector Wetherille to the defendant at his home during the period between December 21, 1955, and December 31, 1955, when the state contends there was attempted concealment and the purpose to flee in order to avoid questioning and arrest, has not been controverted by the state. The record indicates that an attempt was made by the defendant to serve a subpoena on Inspector Wetherille during the course of the trial but that the process server was unable to get service due to the inspector's absence from the city. While the captain of police in that instance informed the process server that Wetherille was not there, the record does not show that he informed the process server as to the inspector's whereabouts. It would only be fair to assume, however, that the inspector was absent on other official business.

During this period of time, as well as at the time when Officers Ott and Greaves appeared at the defendant's home, the defendant was not charged with any crime. Apparently the only information that had come to him in a direct manner indicating that he was being implicated in the kidnapping by Thompson, in addition to what Inspector Wetherille told him over the telephone, had appeared in newspaper articles. However, the very next day after Officers Ott and Greaves had appeared

at defendant's home, the defendant voluntarily, with one of his sons, went to the courthouse in Minneapolis and was arraigned and released on bond. We find no testimony which may be properly classified as direct showing any attempt or effort on the part of the defendant to conceal himself or flee in order to avoid questioning or arrest which stands the statutory and legal corroborative test and justifies instructions in the court's charge on either concealment or flight. The record discloses no direct testimony of concealment in the face of questioning or arrest or attempted effort to flee the community or the city in which he lived and in which the crime had been perpetrated, no resistance thereto nor to any officer, nor the use of an assumed name, or any legal proof of false statements established by the evidence regarding his whereabouts when the crime was committed or thereafter during the period before he voluntarily appeared for arraignment.

We think clearly the aforesaid testimony on concealment and flight has no basis in the present state of the record for coming under the classification of evidence corroborative of that of an accomplice tending to convict the accused of the commission of the offense charged. To substantiate their charge of concealment and flight, the state mainly relies upon State v. McTague, 190 Minn. 449, 252 N. W. 446. In that case the defendant was accused of arson. Much of the evidence relied upon in that case by the state was circumstantial. An important fact to be found in the evidence submitted in that case was the fact that the defendant fled from the jurisdiction after his arrest and when out on bail. There was direct proof that he had left the geographical area. He was in fact thereafter taken into custody in New Orleans. He had left the area where the crime had been committed fully realizing what crime he was suspected of having committed since he had already been arrested and given bail. In the instant case the defendant discussed the matter with Inspector Wetherille several times over the telephone advising him that he would come down if they would send a car for him and, if he was being charged with a crime, that he be permitted to be arraigned and to give bond. He had not been arrested nor even advised, so far as the record shows, to apprise the police of his movements. Nevertheless he is charged with a form of concealment and flight before arrest although the information charging him with the crime of kidnapping

never was issued until January 20, 1956, 20 days after the defendant made his voluntary appearance. Clearly the facts in State v. McTague are distinguishable and the reception of evidence of flight in that case and the giving of an instruction on flight to the jury is understandable and finds support in the decisions of this jurisdiction as well as in others.

■ The issue therefore presented on this appeal is whether the defendant was deprived of a fair trial because of the court's charge to the jury on the issue of concealment and flight in view of the quality of the evidence submitted on that issue. It appears that, while the instruction was given largely on concealment, it was however stated in the instruction that on the other hand the defendant and witnesses on his behalf contend that he did not conceal himself or flee from questioning or arrest. This statement suggested flight as well as concealment had been perpetrated against the state on the part of the defendant. The alleged attempt on the part of the defendant of which the state complains is he thwarted the efforts of the police, including investigating and arresting officers, prior to his voluntary appearance on December 31, 1955.

The county attorney argued that there was corroborating evidence on the issue of concealment and flight tending to convict the accused. It was argued that Inspector Wetherille called defendant up over the telephone and gave him a chance to come in voluntarily and that he did not come in until December 31, 1955. Yet the state failed to call Inspector Wetherille as a witness although it would seem that necessary arrangements could have been made to have him present to testify as a witness upon his return to the city. The inspector could not be asked to tell about his talks with the defendant over the telephone or to testify as to what was said in those telephone conversations since he could not because of his absence from the city be reached by the process server through whom the defendant sought to obtain him as a witness. Nevertheless, much was made of the claim of concealment and flight due to the inspector's having called and talked to the defendant over the telephone and because of the testimony produced on the part of Officers Ott and Greaves for the purpose of impeaching the testimony of defendant's wife yet in fact none of such evidence has any standing as

direct evidence tending either to establish attempted or purposeful concealment or flight from questioning or arrest.

An answer given to an impeaching question is not substantive evidence of the fact included in it. Its use is confined to a contradiction of the witness to whom the question is put and proof that a witness made statements inconsistent with his testimony merely discredits the witness and does not tend to prove the truth of the statements. Christensen v. Pestorious, 189 Minn. 548, 250 N. W. 363; Pullen v. Chicago, M. St. P. & P. R. Co. 178 Minn. 347, 227 N. W. 352.

■ The record does not disclose evidence that Officers Wasser, Neuenfeldt, or other officers spoke with or attempted to speak with defendant at the scene of the crime or to take him into custody at the scene of the crime, nor that defendant resisted arrest at the scene of the crime. No officer has testified that he gave any false name or that he sought to conceal himself at the scene of the crime, and no one has attempted to testify that the defendant fled from the scene of the crime or that they saw him flee from the scene of the crime. There is no testimony that the words "Hi, Russ" heard by Rick and Neuenfeldt at the scene of the crime were spoken by the defendant, nor is there any evidence on the part of any officer that the defendant was aware of what the officers were doing at the scene of the crime and that he left after acquiring such knowledge, nor is there any evidence, if the person seen by Neuenfeldt and Wasser at the scene of the crime was the defendant, that he left the scene of the crime before these officers attempted to arrest him. Under the circumstances what legal evidence if any exists to support the state's position that the defendant attempted both concealment and flight, and that the evidence thereon justifies an instruction to the jury on the issue of concealment and flight? We think it manifest that the state's position based upon the evidence as it now stands is both legally untenable and unsupported by authority.[2]

■ Unless there is admissible evidence of facts or of circumstances

[2]State v. Goodwin (Mo.) 217 S. W. 264; State v. Manigan, 164 Iowa 434, 145 N. W. 869; Orin v. People, 68 Colo. 1, 188 P. 1114; State v. Cook, 212 Minn. 495, 4 N. W. (2d) 323; State v. Shetsky, 229 Minn. 566, 40 N. W. (2d) 337.

from which the facts of concealment and flight may be inferred and to which the instruction on that issue may apply, it should not be given. There is no direct evidence in the record of concealment or flight on the part of the defendant nor do we think that circumstantial evidence has been produced from which the jury could justifiably infer that there was under all the circumstances either concealment from questioning or arrest or an attempt to flee therefrom. State v. Cook, 212 Minn. 495, 4 N. W. (2d) 323. It makes no difference whether the guilt of the defendant may have been otherwise conclusively proved. Every defendant charged with a crime is entitled, in our courts, to a fair and impartial trial. Nevertheless, leaving out the alleged concealment or flight angle in the instant case, the weight of the corroborative evidence submitted to support the evidence of the alleged accomplice Thompson, who first named his accomplices on the evening of his arrest; then later changed his mind and named defendant; and later asked to withdraw his plea on the grounds of insanity, is by no means so convincing as to in fairness suggest that the evidence as to concealment and flight and the instruction given thereupon was without prejudice to the defendant at the trial.

The record indicates that, after the jury had retired to deliberate, the jurors requested a rereading of portions of the testimony that might indicate the condition of and the amount of light available in the vicinity of the Humpty-Dumpty store on the night of the kidnapping. The jurors also requested a rereading of the testimony of the state's witness Neuenfeldt to indicate how long a time he had spent at the home of the defendant when he went there to obtain a policeman's badge a year previous to December 21, 1955. The county attorney objected to the jury's requests and they were denied. The inference could well be that the jurors were not satisfied with that portion of the state's corroborating testimony furnished by the state's witness Neuenfeldt that the man he saw in the vicinity of the Humpty-Dumpty store on the night of the kidnapping was in fact the defendant.

■ Upon the whole of the evidence submitted and in the absence of any testimony in fact showing any attempt, effort, or purpose on the part of the defendant to conceal himself from the authorities or to flee from questioning, arrest, or the city in which the crime was

committed, we think the instruction on concealment and flight was highly prejudicial and sufficient in itself to make a reversal of the instant case necessary.

Having made our decision on this point, we consider it unnecessary to discuss any other issues which may appear to have been raised upon this appeal.

To hold that the facts proved are conclusive of defendant's guilt and that therefore whatever remarks were made by the county attorney and by the court on the issue of concealment and flight are not prejudicial would violate the right of this defendant to have the benefit of a fair and impartial trial.

The judgment appealed from is reversed, the sentence vacated, a new trial is granted, and the case remanded.

Reversed.